# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| CHRISTOPHER A. ATKINSON,      ) | |
|          ) | |
|     **Plaintiff,**       ) | |
|          ) | |
| **v.**          ) | **CAUSE NO. 1:16-cv-00156-SLC** |
|          ) | |
| **COMMISSIONER OF SOCIAL**     ) | |
| **SECURITY,** *sued as Nancy A. Berryhill,*[1] ) | |
| *Acting Commissioner of SSA,*     ) | |
|          ) | |
|     **Defendant.**      ) | |

## OPINION AND ORDER

Plaintiff Christopher A. Atkinson appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for disability insurance benefits ("DIB").[2] (DE 1). For the following

reasons, the Commissioner's decision will be AFFIRMED.

### I. PROCEDURAL HISTORY

Atkinson applied for DIB in February 2013, alleging disability as of September 29, 2012.

(DE 9 Administrative Record ("AR") 158-59). The Commissioner denied Atkinson's

application initially and upon reconsideration. (AR 106-12). After a timely request, a hearing

was held on July 17, 2014, before Administrative Law Judge William D. Pierson ("the ALJ"), at

which Atkinson, who was represented by counsel; his mother; and a vocational expert, Sandy

Steele (the "VE"), testified. (AR 30-80). On November 13, 2014, the ALJ rendered an

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d
322 (7th Cir. Jan. 30, 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed.
R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge. (DE 12); *see* 28 U.S.C. § 636(c).

unfavorable decision to Atkinson, concluding that he was not disabled because he could perform a significant number of unskilled, sedentary jobs in the economy despite the limitations caused by his impairments. (AR 14-25). The Appeals Council denied Atkinson's request for review (AR 1-8), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. § 404.981.

Atkinson filed a complaint with this Court on May 16, 2016, seeking relief from the Commissioner's decision. (DE 1). Atkinson's sole argument on appeal is that the ALJ improperly evaluated his symptom testimony. (DE 17 at 8-12).

## II. FACTUAL BACKGROUND[3]

At the time of the ALJ's decision, Atkinson was 41 years old (AR 25, 174); had a high school education and one year of college (AR 37, 187); and had worked as a pharmacy technician at a hospital from 1995 to 2012. (AR 177, 242). Atkinson alleges disability due to left leg amputation above the knee, with phantom pain; residuals of left extremity fractures; depression; and anxiety. (DE 17 at 2).

### A. Atkinson's Testimony at the Hearing

At the hearing, Atkinson testified as follows: He was single and had recently applied for Medicaid. (AR 36-37). His mother had driven him to the hearing, as he had an expired license. (AR 37). He had not consumed alcohol in the last year. (AR 43). He performs light household tasks, such as cooking in the microwave or on the grill and doing small loads of laundry. (AR 49, 54). He can hold a cup with his left hand, but has difficulty bending his arm to drink from the cup; he is able to use utensils. (AR 50). He is able to help with yard work by trimming small

---

[3] In the interest of brevity, this Opinion recounts only the portions of the 603-page administrative record necessary to the decision.

branches and riding the lawn mower. (AR 53-54). Atkinson rarely left home in the first seven months after his September 2012 motor vehicle accident; his ability to leave home has improved since then, but he still does not go out in public very often. (AR 44, 47-78, 57-58, 66). He visits a few friends or his brother every few weeks, depending on others for transportation. (AR 45-46, 57-58).

Atkinson cited limitations in his non-dominant, left upper extremity as a reason for his disability application. (AR 48). He explained that he had fractured his arm in three places in the accident, and one of the fractures still had not healed because "it looked like the bone ends had died." (AR 48, 51). He had not, however, seen a doctor for his arm or had an X-ray in the past 17 months. (AR 48). He has left arm pain with every movement, numbness down his arm, elbow stiffness, limitation in his arm range of motion, and tingling in his fingers; consequently, he primarily uses his dominant, right upper extremity for tasks. (AR 48, 51-52, 59, 63). On a 10-point scale, he rated his arm pain as a "three or four" with medication and a "five" without medication. (AR 52-53). His pain worsens with strenuous work. (AR 53). Physical therapy had given him a home exercise program because he could not afford to attend physical therapy regularly. (AR 42). He estimated that he could lift 20 pounds with his right hand, five pounds with his left hand, and 10 pounds with both hands. (AR 58, 63). He could use his left hand for light activity for about 15 to 20 minutes but then would need to rest it for an hour. (AR 64).

Atkinson also complained of experiencing constant phantom pain as a result of his left leg amputation. (AR 55). The pain intensity varies with activity; the more activity, the more intense the phantom pain. (AR 55). When he mows the lawn, he has to take a break halfway through to massage his stump because the vibration from the mower irritates it. (AR 55). If he

over exerts himself in one day, he will need the next day to recuperate.  (AR 47).  He has

difficulty sleeping due to phantom pain that keeps him up most of the night.  (AR 45).  He takes

Neurontin for his phantom pain, which is somewhat helpful.  (AR 55-56).  He estimated that he

could stand for 30 minutes, sit for one hour, and walk for 100 feet; if he walks on uneven ground

or farther than 100 feet, he uses a cane.  (AR 56-57, 59, 66).  He has to remove his prosthesis and

massage his stump intermittently throughout the day; he also sits with his stump elevated, such

as in a recliner, for  an hour of every day for pain relief.  (AR 65).  At least one to two days

week, he has to go without his prosthesis due to phantom pain and sores on his stump; on those

days he uses crutches.  (AR 65-66).

Additionally, Atkinson complained of depression, but conceded that it is much better

when taking his medication.  (AR 44).  He has also experienced anxiety since the accident.  (AR

44, 47).  He complained of inability to concentrate due to his phantom pain and daytime

drowsiness as a side effect of his medications.  (AR 46, 62).  He estimated that he would

probably be unable to concentrate for at least one to two hours in an eight-hour workday.[4]  (AR

63).

### B.  Summary of the Relevant Medical Evidence

Atkinson was injured in a motor vehicle accident in September 2012.  (AR 505).  He

underwent surgeries relating to the left proximal tibia/fibula synostosis joint, a proximal ulna

fracture, a complex fracture-dislocation left elbow, and a left below-knee amputation with

---

[4] Atkinson's mother also testified at the hearing, essentially corroborating Atkinson's testimony.  (AR 67-72).

secondary closure.[5]  (AR 505).

On November 15, 2012, Atkinson visited Dr. Jason Heisler at Ortho Northeast, who observed that Atkinson's condition had significantly improved.  (AR 516).  Dr. Heisler estimated that Atkinson could return to work on December 3, 2012, with modified duties of "sitting work only and no left handed work."  (AR 516).

On January 3, 2013, Atkinson returned to Dr. Heisler, who indicated that Atkinson's condition had slightly improved.  (AR 517).  Atkinson reported a dull, achy pain ranging from a "four" to a "seven" on a 10-point scale.  (AR 517).  The pain occurred intermittently and with activity, and his left shoulder had become quite painful.  (AR 517).  His sensation was normal.  (AR 518).  He was instructed to be weightbearing and to do activity as tolerated.  (AR 518).  Later that month, Atkinson underwent repair of his left olecranon for non-union of ulna with compression and removal of the orthopedic implant.  (AR 520).  Atkinson returned to Dr. Heisler on January 22, 2013, reporting an intermittent sharp, burning, and stabbing pain that increased with activity, which ranged from a "four" to a "six" on a 10-point scale.  (AR 523).  Dr. Heisler assessed that Atkinson's condition had moderately improved, and he estimated that Atkinson could return to work without restrictions within two months.  (AR 523-24).

On January 7, 2013, Atkinson saw Dr. Shankaran Srikanth to request a prescription for Neurontin for his phantom pain.  (AR 528).  Dr. Srikanth prescribed the medication and assessed Atkinson with phantom-pain syndrome.  (AR 528).  Atkinson returned to Dr. Srikanth on February 20, 2013, to discuss management of his depression and his pain.  (AR 530).  He was

---

[5] The ALJ's decision and Atkinson's brief refer to his amputation as being above the knee (AR 16, 19, 20, 21, 23; DE 17 at 2), but the surgical report reflects a below-the-knee amputation (AR 505).  This discrepancy, however, is not material to the outcome of this Opinion and Order.

taking Tramadol, but it was not providing enough pain relief so he was also taking some Norco. (AR 530). Dr. Srikanth stopped the Neurontin, and prescribed Gabapentin and Norco. (AR 530). Dr. Srikanth assessed Atkinson's depression as fairly severe and referred him to Dr. M.S. Kamal, a psychiatrist. (AR 530).

On March 8, 2013, Atkinson was evaluated by Dr. Kamal, reporting worsening depression, severe anxiety, difficulty sleeping, and not wanting to leave home. (AR 570). He was a past alcoholic, but had been sober since the accident. (AR 570). He denied current suicidal or homicidal ideation. (AR 570). A mental status exam revealed decreased psychomotor activity; a tearful appearance, depressed mood, and restricted affect; and fair cognition, memory, and insight. (AR 570-71). Dr. Kamal diagnosed him with a major depressive episode, single severe; and a history of alcohol abuse, in remission. (AR 571). Dr. Kamal assigned a Global Assessment of Functioning ("GAF") score of 50 and started Atkinson on Wellbutrin and Remeron.[6] (AR 571). On March 22, 2013, Atkinson told Dr. Kamal that he was tolerating his medications well, but that he felt worthless. (AR 568). Dr. Kamal explained to Atkinson that the medications take some time to be fully effective. (AR 568).

On March 28, 2013, Atkinson returned to Dr. Heisler, reporting intermittent arm pain of variable intensity. (AR 548-49). Dr. Heisler assessed that Atkinson's condition had significantly improved. (AR 548). Dr. Heisler examined X-rays of Atkinson's left elbow,

---

[6] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.* "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, two medical sources of record used GAF scores in assessing Atkinson, so the GAF is relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

stating that they showed a "slow progression of healing." (AR 549). Atkinson had minimal swelling and tenderness of his left elbow; his sensation was normal. (AR 549). Dr. Heisler instructed Atkinson to engage in weightbearing and activity as tolerated and to use a bone stimulator. (AR 549). He released Atkinson to return to work with the following restrictions: alternate sitting and standing, splitting his day evenly between the two positions; and may occasionally lift and carry up to 10 pounds. (AR 549). Atkinson was to return in two months after having new X-rays of his left elbow. (AR 549).

On April 15, 2013, Atkinson visited Dr. Kamal for a follow-up on his depression. (AR 566). Atkinson reported that he was still quite depressed, had sleeping problems, and did not want to leave home. (AR 566-57). He appeared a little tense and emotional. (AR 566). Dr. Kamal's diagnoses were major depressive disorder, single episode, no psychotic behavior; and alcohol abuse, nondependent, unspecified duration. (AR 566).

On April 18, 2013, Atkinson underwent a psychological evaluation by Dr. Ceola Berry at the request of the state agency. (AR 550-52). Atkinson's mood was dysthymic, and he admitted to problems with affect regulation. (AR 550). He reported debilitating depression, anxiety, and anger, describing himself as hypersensitive to criticism with gross feelings of inadequacy. (AR 550). He had adequate concentration and attention to task. (AR 551). He endorsed suicidal ideation, but did not have plan; he denied homicidal ideation, delusions, hallucinations, and obsessive-compulsive preoccupation. (AR 551). He described himself as nervous, anxious, tense, and easily annoyed. (AR 551). The results of the mental status examination did not reveal any significant problems with concentration, short-term memory, mental calculations, abstracting ability, general knowledge, or judgment. (AR 551-52). His energy level was low,

and he reported reacting with depression, anxiety, and irritability prompted by nonrestorative sleep secondary to his chronic pain. (AR 552). Dr. Berry concluded that Atkinson's ability to work "would be primarily affected by his perceived physical limitations and secondarily by mood states." (AR 552). She assigned him diagnoses of a major depressive disorder and a mood disorder due to his medical conditions and a GAF score of 50. (AR 552).

On April 20, 2013, Dr. James Chan examined Atkinson at the request of the state agency. (AR 554-60). Atkinson reported that he still had significant pain, which worsened at night. (AR 554). On physical exam, Atkinson demonstrated a slow, unsteady gait without a cane. (AR 557). When corrected with a cane, he had a normal posture, and his gait was sustainable and stable. (AR 557). No ataxia, antalgia, circumduction, or lurching was observed. (AR 577). He was able to get on and off the table without assistance. (AR 557). He was able to walk on heels and toes, tandem walk, and squat; straight-leg raise tests were normal in both sitting and supine. (AR 557). He had 4/5 strength in his left shoulder abduction, external rotation, and internal rotation; a mildly positive impingement sign was observed. (AR 557). He had good hip range of motion and strength, and normal muscle tone, grip strength, and reflexes. (AR 557). His left upper extremity sensation was intact. (AR 557). Dr. Chan indicated that Atkinson's fine finger skills with his left hand were "[a]bnormal," but that he was still able to pick up a coin and keys, button a shirt, use a zipper, open a door or a jar, and write with a pen. (AR 560). However, he could not do these fine finger skills "repetitively." (AR 560). Dr. Chan opined: (1) that physical therapy services would help to improve Atkinson's strength and range of motion, assist with ambulation, and reduce his phantom pain; (2) that he should continue to use his cane for improved stability while walking; and (3) that increasing his Zoloft dosage may help control his

depressed mood.  (AR 558).

On April 29 2013, Atkinson reported to Dr. Kamal that he felt much more relaxed and had more energy.  (AR 564).  His sleep had improved, and he was going out more socially.  (AR 564).  Dr. Kamal found that Atkinson seemed to be doing much better, noting that he appeared more relaxed and was relating well; he was not emotional or tearful; and he had "a happy and satisfied look."  (AR 564).

On April 30, 2013, Kenneth Neville, Ph.D., a state agency psychologist, reviewed Atkinson's record and completed a mental residual functional capacity ("RFC") assessment. (AR 87-89).  He concluded that Atkinson was moderately limited in:  (1) maintaining attention and concentration for an extended period; and (2) completing a normal workday and workweek without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  (AR 89).  In his narrative, Dr. Neville further assessed that Atkinson had mild limitations in activities of daily living and in maintaining social interaction; and moderate limitations in maintaining concentration, persistence, or pace.  (AR 89).  Dr. Neville concluded that Atkinson "retains capacity to carry out semi-skilled tasks on a sustained basis in a competitive setting not requiring a rapid pace or intense concentration."  (AR 89).  On June 11, 2013, another state agency psychologist, William Shipley, Ph.D., affirmed Dr. Neville's opinion.  (AR 101-02).

Also on April 30, 2013, Dr. A. Dobson, a state agency physician, reviewed Atkinson's record and concluded that he could lift less than 10 pounds frequently and 10 pounds occasionally; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally balance, stoop, crouch, crawl, and climb ramps and stairs, but never climb

ladders, ropes, or scaffolds; and must avoid moderate exposure to wet, uneven surfaces and hazards such as machinery and unprotected heights.  (AR 86-88).  On June 11, 2013, another state agency physician, Dr. J. Sands, affirmed Dr. Dobson's opinion.  (AR 99-101).

On July 5, 2013, Atkinson reported to Dr. Kamal that things were going very well for him compared to when he first started seeing Dr. Kamal, estimating that he felt "overall 90% better" and that it was a "complete turnaround."  (AR 592).  Dr. Kamal agreed that Atkinson was "doing very well."  (AR 592).

On August 22, 2013, Atkinson returned to Dr. Srikanth, reporting that he was doing well and that Neurontin was working well for him.  (AR 574).  Dr. Srikanth found that Atkinson was stable overall and had adequate pain control, though he was looking to get a second opinion about his elbow pain.  (AR 575).

On September 5, 2013, Atkinson told Dr. Kamal that things were going much better for him, that he had experienced a good summer, and that he had been going out quite a bit.  (AR 591).  Dr. Kamal renewed his prescriptions.  (AR 591).

On February 20, 2014, Atkinson returned to Dr. Srikanth for a follow-up on his phantom-limb pain.  (AR 594).  He reported that he was doing okay, but that Neurontin was helping him only half of the time.  (AR 594).  Accordingly, Dr. Srikanth increased his dosage of Neurontin and Gabapentin.  (AR 594).

On July 16, 2014, Elvira Wallen, a physical therapist, completed a medical assessment form on Atkinson's behalf.  (AR 596-99).  Ms. Wallen opined that in an eight-hour workday, Atkinson could sit for one hour at a time and for one hour total; stand for 10 minutes at a time and one hour total; and walk for 10 minutes at a time and one hour total.  (AR 596).  She noted

that Atkinson's prosthesis was ill fitting and that he usually uses a cane when ambulating on uneven surfaces or outside, but when indoors he uses furniture to stabilize himself. (AR 596). She found that he would be unable to walk on uneven surfaces at a reasonable pace for one block. (AR 596). Ms. Wallen further found that Atkinson could frequently twist and climb stairs; occasionally bend, squat, crouch, crawl, stoop, and balance, but never kneel or climb ladders; and must avoid unprotected heights, moving machinery, vibrations, humidity, and walking on rough ground. (AR 596-97). With his left hand, he could grip, grasp, and perform gross manipulation on a "frequent" basis. (AR 597). He could perform fine manipulation with his left hand on an "occasional" basis. (AR 597). He could lift or reach with his left arm one to two times in an eight-hour workday. (AR 597). A three-trial test of his grip strength was 105, 100, and 99 pounds on the right, and 80, 70, and 79 pounds on the left. (AR 597). A three-trial test of his pinch strength was 24, 23, and 24 pounds on his right, and 16, 14, and 14 pounds on the left. (AR 597). Ms. Wallen opined that Atkinson could lift five pounds frequently and 10 pounds occasionally with his left arm, but never lift 20 pounds. (AR 597). He could carry 10 pounds occasionally when using both arms, but never carry 20 pounds. (AR 597).

In her narrative comments, Ms. Wallen stated that Atkinson was unable to push or pull with a sled due to pain and weakness in his left elbow; that his bilateral carry was unsafe after five pounds due to pain and limited grip strength with his left arm. (AR 598). She opined that his standing and walking activities were compromised by pain and pressure-point ulcers in his stump; after 10 minutes of walking or standing, he had to sit down to relieve the pain in his left leg. (AR 599). She recommended that he use a TENS unit to ease his phantom pain. (AR 599).

On July 10, 2014, Atkinson visited Dr. Srikanth for a follow-up on his phantom pain.

(AR 601-02). Dr. Srikanth indicated that Atkinson's phantom pain was "overall stable." (AR 601).

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[7] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

---

[7] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

*B. The Commissioner's Final Decision*

On November 13, 2014, the ALJ issued a decision that ultimately became the Commissioner's final decision.  (AR 14-25).  At step one, the ALJ concluded that Atkinson had not engaged in substantial gainful activity after his alleged onset date.  (AR 16).  At step two, the ALJ found that Atkinson had the following severe impairments:  above-the-knee left leg amputation and residuals of left upper extremity fractures.  (AR 16).  At step three, the ALJ concluded that Atkinson did not have an impairment or combination of impairments severe enough to meet or equal a listing.  (AR 19).

Before proceeding to step four, the ALJ determined that Atkinson's symptom testimony was "not entirely credible (other than for a period of well less then 12 consecutive months)." (AR 21).  The ALJ then assigned Atkinson the following RFC:

> [T]he claimant is able to lift, carry, push, and pull 10 pounds
> frequently and occasionally, throughout the workday.  In an eight-
> hour period, he is able to sit for a total of 6 hours and stand/walk
> for a total of 2 hours.  He is occasionally able to kneel, crouch,
> balance, and squat.  He cannot crawl or climb ladders, ropes, or
> scaffolds.  He can occasionally climb ramps and stairs (1-2 flights
> with rails), as well as occasionally bend and stoop in addition to
> what is required to sit.  He is able to frequently but not constantly
> finger, feel, grip, and engage in fine manipulation of small objects
> with his left/nondominant upper extremity.  He is able to
> frequently but not constantly engage in gross manipulation,
> handling, grasping, turning, and gripping of larger objects with the
> left/nondominant upper extremity.  He cannot perform work
> requiring concentrated exposure to hazards of open and dangerous
> machinery, hazards of open heights, work upon wet surfaces, or
> within extreme amounts of humidity.  It is also best for him to
> avoid significant vibration to the body.  He also needs to use a
> cane for prolonged ambulation and upon uneven surfaces.

(AR 19).  The ALJ found at step four that Atkinson was unable to perform his past relevant work.  (AR 23).  At step five, based on the assigned RFC and the VE's testimony, the ALJ

concluded that Atkinson could perform a significant number of unskilled, sedentary jobs in the economy, including information clerk, general office clerk, order clerk, and sorter/packager. (AR 24). Therefore, Atkinson's application for DIB was denied. (AR 25).

## C. The ALJ's Consideration of Atkinson's Symptom Testimony Will Be Affirmed

Atkinson's sole argument on appeal is that the ALJ improperly discounted the credibilty of his symptom testimony. After considering Atkinson's arguments, however, the ALJ's credibility determination is amply supported and will not be disturbed.

An ALJ's credibility determination concerning a claimant's symptom testimony is entitled to special deference because the ALJ is in the best position to evaluate the credibility of a witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988) (citation omitted), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citation omitted), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness"). "[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994) (citations omitted).

Here, the ALJ found Atkinson's symptom testimony "not entirely credible" for a list of reasons. (AR 21). To begin, the ALJ explained that he found Atkinson's claims of problems

with his prosthesis fit, severe medication side effects, the need to elevate his leg, and an unhealed fracture in his left arm, to lack the support of medical evidence of record. (AR 21). The ALJ also considered that although Atkinson told his doctors that his medications controlled his pain only half of the time, he did not report these problems after his Neurontin dosage was increased in February 2014. (AR 21). Additionally, the ALJ found that Atkinson's assertion of significant mental health limitations was not credible, considering that the medical records revealed that he quickly improved after beginning mental treatment with Dr. Kamal and that his social activities increased dramatically. (AR 18). Finally, the ALJ found that the treatment notes did not support Atkinson's testimony that he had great difficulty using his left hand. (AR 21-22). Atkinson challenges all the reasons provided by the ALJ for discounting the credibility of his symptom testimony.[8]

1. <u>Prosthesis Problems, Phantom Pain, and Elevation of His Leg</u>

Atkinson first alleges that the ALJ erred in discounting his alleged prosthesis problems—that is, that he had to remove his prosthesis anywhere from an hour a day to all day to massage his stump, and that at least one to two days a week he has to leave his prosthesis off all day. (DE 17 at 8 (citing AR 65, 115)). While the ALJ acknowledged that Atkinson may occasionally need to remove his prosthesis for a few hours once a week, he discounted Atkinson's claim about the frequency and the length of time that he needed to remove his prosthesis. (AR 21). The ALJ did so because he found "no evidence in the record that [Atkinson] frequently or regularly needs to be seen by medical personnel (including orthotics)

---

[8] Initially, Atkinson also asserted that the ALJ erred by discounting his testimony that he needed to use a cane. (DE 17 at 10, 12). But Atkinson withdrew this argument in his reply brief, conceding that the ALJ did not discount his symptom testimony on this basis. (DE 27 at 4).

for problems with his prosthesis." (AR 21). The ALJ further observed that "[t]he record . . .

[does not] document ongoing physical therapy and does not document frequent visits for

prosthetic refittings." (AR 22).

Atkinson argues that the ALJ violated Social Security Ruling 96-7p by negatively

inferring that his testimony about his prosthesis problems was not entirely credible because he

did not seek regular or frequent treatment for such problems.[9] In that regard, Social Security

Ruling 96-7p instructs:

> [An ALJ] must not draw any inferences about an individual's
> symptoms and their functional effects from a failure to seek or
> pursue regular medical treatment without first considering any
> explanations that the individual may provide, or other information
> in the case record, that may explain infrequent or irregular medical
> visits or failure to seek medical treatment.

1996 WL 374186, at *7 (July 2, 1996); *see also Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir.

2014). Atkinson emphasizes that he testified that he had applied for Medicaid but had been

turned down, and that although Dr. Heisler of Ortho Northeast had talked about additional

surgery, he had no insurance at the time, and, in fact, had to cancel his next appointment. (AR

61). Atkinson contends that on this record evidencing limited financial means, the ALJ should

not have discounted the severity of his prosthesis problems due to a lack of treatment history.

Here, the ALJ did, in fact, consider Atkinson's lack of health insurance and his inability

to afford some medical attention, including that he could not afford to attend physical therapy

beyond a few months. (AR 20-21). But despite his limited finances, the record reveals that

---

[9] Social Security Ruling 96-7p was superseded by Social Security Ruling 16-3p in March 2016, *see* SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016), but Social Security Ruling 96-7p governed at the time the ALJ issued his decision, and both parties refer to Social Security Ruling 96-7p in their brief. Accordingly, the Court, too, will refer to SSR 96-7p.

Atkinson still saw medical providers in 2013 and 2014 for various complaints. At these appointments, Atkinson did not complain of an ill-fitting prosthesis that caused sores such that he needed to spend an entire day, once or twice a week, massaging his stump with his prosthesis removed. (*See, e.g.*, AR 554, 574, 578, 594, 601). Considering this record of medical visits, the ALJ did not run afoul of SSR 96-7p by discounting the credibility of his complaints based on Atkinson's failure to complain about prosthesis problems to his medical providers.

Having said that, regardless of problems with pressure sores, Atkinson claimed that he also had to remove his prosthesis due to phantom pain. (AR 65 ("[I need to go without the prosthesis] [a]t least one or two days a week. Between the sores and the phantom pain, I'll always give it at least one day of just air time to heal, to get air to the sores.")). Atkinson did discuss phantom pain at his medical appointments in 2013 and 2014. (*See, e.g.*, AR 558, 574, 578, 594, 601). Nevertheless, the medical evidence concerning his phantom pain does little to bolster the credibility of his claimed need to leave his prosthesis off one to two days a week.

To explain, the medical records reveal that Atkinson's phantom pain was "overall stable" and "adequately controlled" with Neurontin in August 2013. (AR 575). Although Atkinson told Dr. Srikanth in February 2014 that his phantom pain was only controlled half of the time, Dr. Srikanth increased Atkinson's Neurontin dosage, and at his next appointment in July 2014, Atkinson had no complaints, and his phantom pain was again described as "overall stable." (AR 594, 601-02).

Atkinson suggests, however, that his reporting to Dr. Srikanth at his July 2014 appointment that he was running out of Neurontin "a little early" (AR 601) should be interpreted as his need for "more and more medication to control his pain." (DE 17 at 11). But there is no

evidence to support Atkinson's assertion, as Dr. Srikanth indicated at his July 2014 appointment that his phantom pain was "overall stable." (AR 602). "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove [his] claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1512(c)). Here, Atkinson has not provided evidence sufficient to carry his burden. Accordingly, the ALJ was not "patently wrong" when he concluded that Atkinson's complaints of disabling phantom pain were not entirely credible.[10] *Powers*, 207 F.3d at 435.

Atkinson also contends that the ALJ improperly discounted his testimony concerning his need to elevate his leg an hour every day. (AR 65). The ALJ considered Atkinson's testimony about his need to elevate his leg but ultimately discounted it, explaining that "there is nothing persuasive in the medical evidence of record to support this contention and he did not exhibit severe edema." (AR 21). In disputing the ALJ's reasoning, Atkinson emphasizes that he testified that he needs to elevate his leg due to pain, not edema, and that "the treatment records do not contradict [this] testimony." (AR 17 at 10-11). But Atkinson again fails to appreciate that it is he, as the claimant, who bears the burden of producing medical evidence supporting the need to elevate his leg. *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("[T]he primary responsibility for producing medical evidence demonstrating the severity of impairments remains with the claimant." (citation omitted)). Atkinson does not cite to any medical source of record who stated that he needs to elevate his leg. (DE 17 at 10-11; DE 27 at 2). As a result, the ALJ's observation that there was "nothing persuasive in the medical evidence

---

[10] In any event, the VE identified a significant number of jobs that a hypothetical individual with Atkinson's RFC could still perform even if such individual had to spend one day a week without his prosthesis and instead using crutches. (AR 25, 78).

of record[, such as edema,] to support this contention" was accurate. (AR 21). Accordingly, the ALJ did not err by discounting Atkinson's symptom testimony that he needed to elevate his leg an hour every day where no medical provider had opined to that effect.

        2. Medication Side Effects

Atkinson also argues that the ALJ improperly discounted his testimony that he suffers from constant drowsiness as a side effect of his medications. (AR 46). More particularly, the ALJ reasoned: "[A]lthough [Atkinson] alleged that he suffers from severe drowsiness as a medication side effect, the medical evidence of record does not contain persuasive documentation of severe medication side effects, resulting in significant limitations of function, per treating physician, that could not be managed by medication changes or dosage adjustments." (AR 21).

Atkinson challenges the ALJ's reasoning, citing *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). In *Terry*, the Seventh Circuit stated: "[W]e are skeptical that a claimant's failure to identify side effects undermines [his] credibility—after all, not everyone experiences side effects from a given medication, and some patients may not complain because the benefits of a particular drug outweigh its side effects." *Id*.; *see Stahl v. Colvin*, 632 F. App'x 853, 860 (7th Cir. 2015) ("[A] failure to report side effects to doctors does not, in and of itself, discredit complaints of 'disabling pain.'" (citing *Terry*, 580 F.3d at 477)).

Having said that, the Court further found in *Terry* that the ALJ had repeatedly mischaracterized the record because the claimant had, in fact, reported medication side effects to her doctors. *Id*. Atkinson, in contrast, does not highlight any mischaracterization of the record by the ALJ with respect to medication side effects. In any event, this reason was just one of

several factors considered by the ALJ when assessing Atkinson's symptom testimony. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (affirming the ALJ's credibility determination because it was not "patently wrong" or "divorced from the facts contained in the record," even though some of the ALJ's findings were "a bit harsh"); *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'"); *Halsell v. Astrue,* 357 F. App'x 717, 723 (7th Cir. 2009) ("[A]lthough the ALJ's reasoning is imperfect, there is substantial evidence supporting her decision to discount [the claimant's] credibility.").

3. Mental Health Limitations

Next, Atkinson argues that the ALJ should not have discounted his mental health complaints on the basis that he reported no suicidal ideation to Dr. Kamal, his treating psychiatrist. Atkinson emphasizes that he did report suicidal ideation to Dr. Berry, who examined him at the request of the state agency in mid-April 2013, and that suicidal ideation can fluctuate in episodic mental illness. (DE 17 at 11 (citing *Lawson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2014)).

In actuality, however, the ALJ discounted Atkinson's complaints of mental limitations because the records reveal that his mental condition significantly improved shortly after starting treatment with Dr. Kamal. (AR 17). The ALJ observed that while mental health examinations in March and April 2013 revealed some abnormalities, Atkinson told Dr. Kamal that he was "much more relaxed," that he had "improved sleep" and "more energy," and that things were "going much better for him." (AR 17, 564). Dr. Kamal, in turn, indicated that objectively, Atkinson was doing much better. (AR 17, 564). The ALJ also considered that by July and September 2013, Atkinson reported to Dr. Kamal that he had made a "complete turnaround" and felt "90%

better." (AR 17, 592). Dr. Kamal again indicated that objectively, Atkinson was doing very well. (AR 17, 592). Based on this record, the ALJ reasonably inferred that while Atkinson had initially reported suicidal ideation, his condition quickly improved with treatment. *See Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences form the evidence before him).

Atkinson also argues that the ALJ erred in discounting his mental limitations based on his report that he went out socially "quite a bit." (AR 17). Atkinson contends that the medical report reflecting that he went out "quite a bit" overstates his social activity because he was only socializing with one or two people. (DE 17 at 11). But Atkinson's argument concerning the number of people he socialized with does not undercut the ALJ's reasoning. The ALJ cited Atkinson's increasing social activity as evidence that his mental health was significantly improving, in contrast to the initial months after his accident when he stayed at home and did not socialize at all. (AR 17).

Atkinson further suggests that the ALJ erred because his conclusion discounting his credibility contrasts with the opinion of Drs. Neville and Shipley, the reviewing state agency psychologists, who considered "essentially the same evidence" (DE 17 at 11) and found him "credible" (AR 89, 102). But Atkinson's characterization of this evidence ignores the fact that the ALJ reviewed Dr. Kamal's July and September 2013 examinations, which were not part of the record when Drs. Neville and Shipley completed their review. Thus, the ALJ had the benefit of reviewing Atkinson's later mental health records that continued to show improvement. Consequently, Drs. Neville and Shipley did not consider "essentially the same evidence" as the ALJ, making Atkinson's final argument challenging the ALJ's credibility determination with

respect to his mental health condition unavailing.[11]

### 4. Left Upper Extremity Limitations

Finally, Atkinson argues that the ALJ improperly discounted his testimony of significant left upper extremity limitations. In particular, Atkinson disputes the ALJ's failure to credit his testimony that one of his left arm fractures had never healed. (AR 48). The ALJ considered this testimony, reasoning as follows:

> Although the claimant also alleged that [one] of his left upper extremity fractures has not healed, there is no radiological evidence in the record to support this contention for the period as of or after September 29, 2013. Instead, the latest x-ray, taken in late March 2013, indicated that the claimant's last upper extremity fracture was healing, albeit slowly. Nonetheless, there is no persuasive reason to believe that this failed to heal within 12 months of the date of his accident.

(AR 21-22). Atkinson nitpicks the ALJ's reasoning, contending that his testimony at the July 2014 hearing that his fracture never healed is not inconsistent with the March 2013 X-rays, which found a "slow progression of healing." (AR 549). In an attempt to interpret his testimony

---

[11] Moreover, the ALJ asked the VE at the hearing whether a hypothetical individual with Atkinson's RFC could still perform the representative jobs of information clerk, general office clerk, order clerk, and sorter or packer, if such individual had the following additional mental limitations:

> [B]ecause of depression or anxiety is limited to simple, routine, repetitive tasks. The individual can maintain the concentration required to perform simple tasks and can remember simple, work-like procedures.

(AR 74-75). The VE responded in the affirmative. (AR 75). The ALJ then repeated the question with respect to the same hypothetical individual, but adding the following additional limitations:

> [T]he individual is limited to superficial interaction with coworkers, supervisors and the public. Superficial is defined as occasional casual contact, no prolonged conversation. Prolonged conversation with coworkers is not required for the purpose of task completion. But contact with supervisors would still involve necessary instruction as needed.

(AR 75). The VE responded affirmatively as to the jobs of general office clerk and sorter or packer, and then identified two other representative jobs, assembler and visual inspector, that the individual could perform. (AR 74-76). Thus, even if the ALJ had incorporated these mental limitations in the RFC, there would still be a significant number of jobs in the economy that Atkinson could perform. (AR 24).

as consistent with the March 2013 X-ray, Atkinson argues that "if it is 'healing,' then it is not healed." (DE 17 at 12).

Again, Atkinson fails to recognize that it is he who bears the burden of producing sufficient evidence to support his claimed disability. *See Scheck*, 357 F.3d at 702; *Flener*, 361 F.3d at 448. Based on the evidence before him, the ALJ reasonably inferred that if Atkinson's left elbow fracture was slowly healing in March 2013, it likely was healed within 12 months of Atkinson's September 2012 accident—that is, by September 2013. *See Stevenson*, 105 F.3d at 1155 (an ALJ is entitled to make reasonable inferences from the evidence before him). Here, Atkinson did not provide any radiological evidence or medical opinion to contradict the ALJ's reasonable inference.

Furthermore, the ALJ assigned "greater weight" to the opinions of Drs. Dobson and Sands, the state agency physicians, who acknowledged that the March 2013 report showed a "slow progression of healing," but further opined that Atkinson's "[c]ondition [was] expected to improve." (AR 87, 99). As such, Drs. Dobson and Sands found that Atkinson could lift less than 10 pounds frequently and lift 10 pounds occasionally; stand or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally balance, stoop, crouch, crawl, and climb ramps and stairs, but never climb ladders, ropes, or scaffolds; and must avoid moderate exposure to wet, uneven surfaces and hazards such as machinery and unprotected heights. (AR 87-88, 99-101). Thus, the ALJ did not err by discounting Atkinson's testimony that his left arm fracture had not healed where such assertion lacked the support of radiological or medical opinion evidence.

Additionally, Atkinson argues that the ALJ improperly discounted his testimony that he suffers from numbness or tingling in his left arm and fingers, causing him to primarily use his

right arm for tasks. (*Compare* AR 48 ("I have numbness down the arm, tingling in the fingers."), *with* 63 ("I have the numbness in the fingers, and the tingling that shoots down the arm.")). When discounting Atkinson's complaints of numbness or tingling in his left arm and hand, the ALJ pointed out that "[th]e progress notes from [Ortho] Northeast repeatedly indicate that the claimant's sensation in his left upper extremity was normal." (AR 22). Indeed, Ortho Northeast's records, as well as Dr. Chan's records, reveal that Atkinson had intact sensation in his left arm and hand. (*See, e.g*, AR 495, 505, 516, 518, 549, 557, 560). In fact, Atkinson even concedes that the record does not document any numbness or tingling in his left upper extremity. (DE 17 at 12).

Likewise, Atkinson's claim of significant deficits in using his left hand for tasks is not supported by the record, as Dr. Chan indicated that Atkinson could perform fine manipulative tasks with his non-dominant left hand, such as picking up a coin or keys, buttoning a shirt, using a zipper, opening a door or a jar, tying a shoe (with difficulty), and writing with a pen. Not to be deterred, Atkinson argues that his physical therapy evaluation completed by Ms. Wallen in July 2014 indicated that he had reduced pinch strength in his left hand, which measured approximately 16 pounds, compared to his right hand, which measured approximately 24 pounds. (AR 597). He contends that this disparity in pinch strength supports his complaints of significant left upper extremity problems. He further argues that Ms. Wallen's limitation to "occasional" fine manipulative tasks with his left hand has the support of objective medical evidence—that is, the pinch strength scores. *See* 20 C.F.R. 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

Atkinson seems to ignore, however, that the ALJ did credit his complaints of left upper

extremity difficulties to a significant degree.  In doing so, the ALJ incorporated into the RFC the following left upper extremity restrictions:

> [Atkinson] is able to frequently but not constantly finger, feel, grip, and engage in fine manipulation of small objects with his left/nondominant upper extremity.  He is able to frequently but not constantly engage in gross manipulation, handling, grasping, turning, and gripping of larger objects with the left/nondominant upper extremity.

(AR 19).  These limitations are consistent with the limitations opined by Ms. Wallen, the consulting physical therapist, in July 2014, with the only exception being that Ms. Wallen limited Atkinson to performing "occasional," rather than "frequent," fine manipulative tasks with his non-dominant, left hand.  (AR 597).  The ALJ provided several reasons for discounting Ms. Wallen's opinion, including that Ms. Wallen, as a physical therapist, is considered an "other source," rather than an "acceptable medical source," under the regulations, *see Thomas v. Colvin*, 826 F.3d 953, 959, 961 (7th Cir. 2016); that she saw Atkinson just one time at the request of his counsel; and that her actual examination results are not of record.  (AR 22).  Atkinson does not materially challenge these reasons.[12]  As the ALJ further noted, the ALJ's fine manipulative limitation is consistent with the opinion of Dr. Chan, who stated in April 2013 that Atkinson was unable to "repetitively" perform fine manipulative tasks with his left hand.  (AR 23, 560).

At the end of the day, "an ALJ's credibility assessment will stand 'as long as [there is] some support in the record.'"  *Berger*, 516 F.3d at 546 (alteration in original) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).  Here, when assessing the credibility of Atkinson's symptom testimony, the ALJ built an adequate and logical bridge between the evidence and his

---

[12] In any event, the ALJ asked the VE at the hearing whether there were jobs that a hypothetical individual with Atkinson's RFC could perform even with the additional limitation of performing "occasional," rather than "frequent," fine manipulative tasks with the left hand.  (AR 76-77).  The VE responded that this additional limitation would eliminate the production occupations (such as assemblers, inspectors, and packers), but that the individual could still perform the occupation of general office clerk.  (AR 76-77).

conclusion, *see Ribaudo*, 458 F.3d at 584, and his conclusion is not "patently wrong." *Powers*, 207 F.3d at 435. Consequently, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will stand, and the final decision of the Commissioner will be affirmed.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Atkinson.

SO ORDERED.

Entered this 28th day of September 2017.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge